**WINDOWS USER, INC., Plaintiff,**

v.

**REED BUSINESS PUBLISHING LTD., Defendant.**

**No. 92 Civ. 2688 (WK)**

United States District Court, S.D. New York.

May 22, 1992.

---

Arthur J. Jacobs, Evan H. Katz, Gersten, Savage, Kaplowitz & Curtin, New York City, for plaintiff.

1. The complaint was served on defendant on April 24. *See* Def.Brief at 5.

2. *See* 15 U.S.C. § 1121; 28 U.S.C. § 1331. Jurisdiction is also proper pursuant to 28 U.S.C. § 1332, as plaintiff is a New York corporation with its principal place of business in New York City, and defendant is a foreign corporation organized under the laws of the United Kingdom, with its principal place of business in England.

William Rand, Coudert Bros., New York City, for defendant.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

By this complaint, filed April 14, 1992 [1], plaintiff seeks a declaratory judgment that it has established priority trademark rights in the name "Windows User" ("the mark"), and that defendant's use of said mark constitutes false designation of goods' origin in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125, and New York's common law of unfair competition [2]. By Order to Show Cause dated May 5, plaintiff moves for a temporary restraining order and preliminary injunction to prohibit defendant from employing "Windows User" or any confusingly similar designation in connection with the sale/marketing of its goods or services. Defendant opposes this motion and cross-moves for a temporary restraining order and preliminary injunction to prohibit plaintiff's use of the above noted mark.

On May 8 we heard oral argument on these motions. For the reasons that follow, both motions are denied.

## BACKGROUND

Sometime in late 1991 plaintiff [3] began creating and developing a magazine on the subject of graphical user interface computer software. Compl. ¶ 7. It anticipates that the premier issue of this magazine will be available for publication in August 1992. Munford Affid. ¶ 2. Intending to name this magazine "Windows User", in early December 1991 it ordered a trademark search report for this mark. This search revealed that no other party had reg-

3. On April 10, 1992, an entity known as Micro Warehouse, Inc. assigned to plaintiff Windows User, Inc. all rights, contingent or otherwise, it had in the mark "Windows User". Compl. ¶ 9. Accordingly, for considerations of convenience, we here refer to the actions of Micro Warehouse, Inc. which predate April 10 as if they had been taken by the instant plaintiff.

istered, applied to register, or otherwise claimed rights in, or use of, the mark in the United States. Accordingly, pursuant to § 1(b) of the Lanham Act, 15 U.S.C. § 1051(b) (1988), on December 6, 1991 plaintiff filed an intent-to-use application with the United States Patent and Trademark Office to register the name "Windows User" as its trademark.

By document dated February 29, the Patent and Trademark Office informed plaintiff that its application for registration on the Principal Register had been denied on the ground that "the mark merely describes the subject matter of the applicant's publication". Lipstein Decl., Exh. D. This document also informed that the mark is not eligible for registration on the Supplemental Register until an amended application which alleges use in commerce has been timely filed. *Id.*

To date plaintiff has not filed an application for registration on the Supplemental Register[4]. In connection with the instant motions, it asserts that it intends, "within the appropriate time to responding to office actions", to file a response, which will overcome the preliminary rejection of its application for the Principal Register[5].

On March 2, plaintiff began subscription promotion activity for its intended magazine. Compl. ¶ 12. In this regard, it published a preview brochure which was distributed along with 50,000 copies of another of its publications, the "Micro Warehouse" sales catalogue, and has contacted approximately 200 potential advertisers. In addition, it informs that it intends to include subscription solicitation materials in future editions of "Micro Warehouse", and, *inter alia*, is in the process of preparing a media kit and 12–page full-color brochure describing the product. *See* Munford Affid. ¶¶ 30–35. Plaintiff asserts that

to date it has spent more than $259,000 for the development of its magazine. *See* Pl. Brief at 6–7.

Commencing in mid-March 1992 defendant began to sell on newsstands in the United States copies of its magazine entitled "Windows User". It is undisputed that the content of this magazine is similar to that prescribed for plaintiff's magazine. In connection with the instant motions defendant submits the affidavit of Glyn Moody, it's Publishing Director, which asserts that defendant first used the mark "Windows User" in the United Kingdom in early 1991, and that it can substantiate use of this mark in U.S. commerce in early 1992. *See* Moody Declar. ¶¶ 1, 2, 14. The relevant facts concerning defendant's use of this mark are as follows.

Commencing in February 1991, defendant published in the U.K. a bi-monthly magazine entitled "Windows User". *Id.* at ¶ 4. More specifically, in the period February through July 1991, it sold said magazine to a limited group of computer companies in the United Kingdom. As a result of the success of the magazine with this group, in July it determined to reposition the magazine as a general consumer publication "primarily for the U.K. market, but with an intention both to solicit advertising from U.S. vendors, and to distribute the publication in the United States and Europe". *Id.* at ¶ 5. As previously stated, defendant did not sell its magazine in the United States until March 1992. However, in connection with its U.K. distributions, during August through December 1991 it solicited, and received, advertisements from various concerns, including U.S. companies[6]. By an editorial written on November 29, and appearing in the December issue of *PC*, another of defendant's European publications, defendant announced the

---

**4.** In addition plaintiff has not—to our knowledge—amended its application for registration on the Principal Register to reflect use in commerce. *See* 15 U.S.C. §§ 1051(a), (c).

**5.** In its moving papers in support of its application for a preliminary injunction plaintiff omitted any reference to the fact that its December 6 application had been denied. After defendant brought this fact to our attention, *see* Def.Mem.

at 13–14, in its reply papers and at oral argument plaintiff took the above described position.

**6.** The advertisements solicited market products in terms of British currency. However, defendant asserts that "[i]n many cases, the sales solicitation was immediately followed by the delivery of a copy of *Windows User* to the solicited party." Moody Declar. ¶ 5.

formal closing of *PC* and the launching of "Windows User"[7].

In furtherance of the intent to publish in the United States, on February 19, 1992 defendant filed an application to register the mark "Windows User" on the Principal Register. *See* Lipstein Declar. ¶¶ 2–4, Exh. A–C. This application lists January 24, 1991 as the date of defendant's first use of the mark in interstate commerce. *Id.* at Exh. C.

During March 5 through April 28 defendant has sought and obtained trademark registrations for the "Windows User" mark in 10 states[8]. In addition, commencing in mid-March defendant has distributed for sale in this country approximately 4,000 copies of the magazine. These sales have occurred in 22 states and 31 cities. *See* Moody Decl. ¶¶ 14–15.

In support of its motion for preliminary relief, defendant asserts that it has incurred expenses "in excess of $10,000" in connection with these distributions. Moody Decl. ¶ 14. It also, however, claims that an anticipated budget for promotional costs for publishing a magazine in the United States may be estimated at $4.5 million, which would indicate that plaintiff's current expenditures would amount to approximately five percent of its anticipated total costs. *See* Def.Mem at 15–16. In addition, defendant submits the affidavits of two persons who are employed in the marketing departments of U.S. computer companies. Both affiants state that they first learned of defendant's magazine in late 1991; received copies of it in, respectively, September or October of 1991, and January 1992; and are unaware of plaintiff's magazine. *See* Washburn Decl. ¶¶ 1, 4, 5, 7; Crampton Decl. ¶¶ 1, 4, 6, 9. In addition, one affidavit, the Washburn Declaration, provides: "If I had received a promotional for *Windows User* magazine from [plaintiff] ... I would have assumed that [it was] ... affiliated with ... [defendant]". Washburn Decl. ¶ 8.

As previously stated, on May 5, 1992 plaintiff moved by order to show cause to enjoin defendant from continuing to use the mark "Windows User". In support of this application plaintiff asserts that it first learned of defendant's intent to publish its "Windows User" magazine in the United States sometime in mid-February 1992, and immediately wrote to defendant to inform it that plaintiff has "prior and exclusive right to utilize the name 'Windows User' for a magazine related to computers and computer software ...", and that consequently any such use by defendant in the United States would be unlawful "subject to an injunction barring ... further publication under any such title"[9]. *See* Munford Affid.Exh. C. (Letter dated February 24); Pl.Mem. at 3–4. Defendant responded to this letter, informing plaintiff that it believed it had superior rights to the mark "Windows User", that it would not cease using the mark, and that plaintiff should "cease and desist from any further promotional efforts" which feature the mark, as such activities violate § 43(a) of the Lanham Act. Munford Affid.Exh. C.

## DISCUSSION

To recover for a violation of § 43(a) of the Lanham Act, a party need not demonstrate that a mark is registered; it must, however, demonstrate that it has a reasonable interest to be protected against false advertising. *New West Corp. v. NYM Co. of Cal., Inc.* (9th Cir.1979) 595 F.2d 1194,

---

7. Advertisements for subscriptions to *Windows User* appeared in another of defendant's publications, *Personal Computer Directory,* which was distributed to defendant's top 300–400 advertisers which include the U.K. branches of major U.S. software companies such as Microsoft, Lotus, Borland, and IBM. Moody Declar. ¶ 9.

8. These registrations indicate first use dates as early as January 24, 1991. As the justifications for said dates are not before us, we do not presently consider these dates evidence of use.

9. The February 24 letter was addressed to Cahners Publishing Company, Inc. ("Cahners"). By letter dated March 12, Cahners informed plaintiff that Reed Business Publishing Ltd., and not Cahners, was the publisher of *Windows User.* Cahner and the instant defendant share the same corporate parent, Reed International, plc., and Cahner forwarded plaintiff's letter to defendant. *See* Munford Declar., Exh. D.

1198 (citing *National Lampoon, Inc. v. American Broadcasting Cos.* (2d Cir.1974) 497 F.2d 1343). Such a reasonable interest is established by a showing of an intent to adopt the mark as a trademark and first *"bona fide"* use of the mark in commerce. *See Hydro–Dynamics, Inc. v. George Putnam & Co., Inc.* (Fed.Cir.1987) 811 F.2d 1470, 1472; *New England Duplicating Co. v. Mendes* ("Mendes") (1st Cir.1951) 190 F.2d 415, 417 ("the exclusive right to the use of a mark ... claimed as a trademark is founded on priority of appropriation")[10].

In connection with the instant motions plaintiff contends that it can demonstrate its exclusive right to use the "Windows User" mark in the United States. In particular, it asserts that having filed an intent to use application for the mark "Windows User" on December 6, it has secured priority rights in said mark; that upon the acceptance of this application, it will be granted a first use date of December 6; and that none of defendant's activities which predate December 6 constitute such use of the mark in commerce in the United States as would entitle defendant to trademark rights in this country. In this regard, it urges us to examine the legislative history of the 1988 Trademark Law Revision Act ("TLRA"), *see* Pub.L. 100–667, 102 Stat. 3935 S. 1883, which adopted a trademark application system based upon "intent-to-use" a mark, and argues that it was Congress' purpose in adopting such a system of trademark registration to permit companies the opportunity to secure rights in a particular mark during the "start up" time it takes for them to promote and develop the product upon which the mark is intended to be used in commerce. *See* Pl. Brief at 14–18. In the event we were to decline to accept December 6 as plaintiff's first use date, plaintiff contends that to date defendant is unable to demonstrate *"bona fide* use" of the mark in commerce, while its own March subscription solicita-

tion activities constitute sufficient use of the mark to grant it proprietary rights thereto.

It is well settled that to obtain injunctive relief in this Circuit, a party must demonstrate irreparable harm and *"either* (1) a likelihood of success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, *and* a balance of hardships tipping decidedly in the movant's favor". *LeSportsac, Inc. v. K. Mart Corp.* (2d Cir. 1985) 754 F.2d 71, 74 (emphasis added). With this as background, we turn first to a consideration of the merits of plaintiff's application for preliminary relief, and then defendant's.

*Plaintiff's Motion for Preliminary Relief*

In the circumstances of plaintiff's motion, we need not address the question of whether or not defendant's use of the mark "Windows User" causes plaintiff to suffer irreparable harm, for we find that plaintiff is unable to demonstrate either a likelihood of success on the merits or that the balance of hardships tips decidedly in its favor. For purposes of plaintiff's motion, we shall accept as true the proposition that defendant's pre-December 6 activities do not constitute a cognizable use of the mark.

*Likelihood of Success*

We do not dispute either plaintiff's recitation of the purpose of the TLRA, or the proposition that that statute permits an "intent-to-use" applicant the right to use the date of the filing of its application as the date of "constructive use of the mark, conferring a right of priority ... on or in connection with the goods or services specified in the registration against any other person ..." 15 U.S.C. § 1057(c). However, we note that Congress expressly provided that the above described rights are "[c]on-

---

**10.** In the instant circumstances the parties do not dispute that each had demonstrated an intent to "adopt" the mark "Windows User" as its

own. *See Hydro–Dynamics,* 811 F.2d at 1473 ("Whether a trademark has been 'adopted' is a

tingent on the registration of a mark on the principal register". 15 U.S.C. § 1057(c) [11].

In the instant circumstances plaintiff's application to register its mark on the Principal Register is not presently pending; it has been rejected, and plaintiff has been instructed that it may apply for registration on the Supplemental Register only if it can allege use in interstate commerce. Plaintiff has not so applied; it simply informs us that it is confident it will ultimately prevail in reversing the preliminary rejection of its application for the Principal Register. *See* Pl.Reply Brief at 11–13. However, on the basis of the facts as they presently exist, we decline to find that plaintiff has demonstrated that it is more probable than not it will be able to establish December 6 as its first use date. *See Centaur Communication, Limited v. A/S/M Communications* (S.D.N.Y.) 652 F.Supp. 1105, *aff'd on other grounds* (2d Cir.1987) 830 F.2d 1217 (finding "Marketing Week", as title of magazine which focuses on marketing news, descriptive); *cf. Merrick v. Sharp & Dohme, Inc.* (7th Cir. 1950) 185 F.2d 713 (noting that the "courts of the United States have no jurisdiction over registration proceedings except that appellate jurisdiction given them by the Trade–Mark Act"). Accordingly we turn to the question of which of the parties' 1992 activities are more likely to constitute the requisite "use in commerce" of the mark in the United States.

15 U.S.C. § 1127 provides, in relevant part, that for purposes of the chapter on trademarks:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark ... [A] mark shall be deemed to be in use in commerce on goods when it is place in any manner

on the goods ... or the displays associated therewith ... and the goods are sold or transported in commerce.

*See New West Corp.,* 595 F.2d at 1199 (noting that this definition applies to 15 U.S.C. § 1125(a)); *Hydro–Dynamics,* 811 F.2d at 1474 [12]. The courts have routinely recognized that to establish "use" in commerce "[a]ctual sale is not necessary". *Mendes,* 190 F.2d at 417–418. The talismanic test is whether or not the mark was used "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark". *Id.; cf. New West,* 595 F.2d at 1200 (finding that "[a]lthough mere advertising by itself may not establish priority of use, ... promotions coupled with advertiser and distributor solicitations unquestionably meet the *Mendes* 'public identification' requirement"). With respect to marks which are magazine titles, the relevant "public mind" or consumer group is comprised of advertisers, subscribers, and newsstand purchasers. *Centaur Communication v. A/S/M Communications* (2d Cir.1987) 830 F.2d 1217, 1221–1222.

In support of its contention that it can establish first use, plaintiff argues that its extensive advertising and promotional campaign, commenced on March 2, "has created, in the minds of many consumers of computer magazines, a strong association between the 'Windows User' mark and plaintiff and its soon to be released *Windows User* magazine", Compl. ¶ 13, while defendant's only use of the mark has been "it's token use of the mark in March 1992, when it sold a commercially nominal number of copies ... of its ... magazine in the United States". Pl.Brief. at 20–21.

We are not persuaded by this argument. First, plaintiff's early March promotional

---

factual finding whose resolution may include elements of subjective intent").

**11.** *See also* 15 U.S.C. § 1051(c) (noting that intent-to-use applicant must submit statement of actual use of the mark in commerce within six months of the date on which the notice of allowance for such an application is issued; and the mark's registration in the Patent and Trademark Office is "[s]ubject to examination and acceptance of ... [said] statement of use").

**12.** For purposes of this motion we shall assume that defendant's delivery to certain U.S. advertisers in late 1991 and early 1992 of gratuitous copies of its U.K. publication of "Windows User" preceded its intention to adopt use of the mark in the United States, and accordingly was not a *bona fide* commercial utilization of the mark sufficient to establish priority rights thereto. *See Hydro–Dynamics, Inc.,* 811 F.2d at 1474.

activities occurred almost simultaneous with the appearance on newsstands of defendant's product, using the mark "Windows User", on newsstand shelves. Although advertisements and promotional activities may be relied on to demonstrate priority in use of a mark, this is the case only where it can be shown that such activity was "of a nature and extent such as to create an association of the term with the user's goods". *See Malcolm Nicol & Co. v. Witco Corp., Inc.* (Fed.Cir.1989) 881 F.2d 1063, 1065 (citation omitted); *Jim Dandy Co. v. Martha White Foods, Inc.* (1972) 59 CCPA 1016, 458 F.2d 1397, 1399. On the other hand, it is beyond cavil that the actual sale to the public of defendant's magazine under the mark "Windows User" was activity which would create an association in the mind of the consumer public between defendant and said mark. *See New England,* 190 F.2d at 418 ("No doubt sales of goods with the mark affixed thereon ... constitute a use ... of the mark ... adequate to establish appropriation and hence ownership")[13]. Second, although plaintiff contends that defendant's sales are "token", it offers no evidence to support this claim apart from the limited size of defendant's distributions. On the other hand it is undisputed that these sales followed defendant's February 19 filing of its federal trademark application for "Windows User", and that this February 19 filing preceded defendant's receipt of plaintiff's February 29 notice that it claimed rights to the "Windows User" mark[14]. In addition, defendant has submitted the Moody affida-vit which provides that as early as July 1991 it had determined to distribute its publication in the United States[15].

Finally, although it is not necessary for one to show actual consumer-association between a party and a mark to support a claim that activities which would create such association have occurred, defendant has submitted the Washburne Declaration which provides that its affiant associates "Windows User" magazine with defendant, whereas plaintiff has submitted no similar affidavit.

■ As it is well settled that "the question of use adequate to establish appropriation remains one to be decided on the facts of each case", *Mendes,* 190 F.2d at 418, and that the court must look to the totality of a party's actions to determine if it has established priority rights in the use of a trademark, *New West,* 595 F.2d at 1200, on these facts we can not say that plaintiff has demonstrated the likelihood that it will prevail on its claim that it can establish the requisite first *bona fide* use of the mark "Windows User" in interstate commerce.

*The Balance of Hardships*

Assuming *arguendo* that plaintiff has at least demonstrated sufficiently serious questions going to the merits, we conclude that the balance of hardships weighs in favor of denying it injunctive relief. First, we take judicial notice of the fact that in the field of computers, technology progresses at an extremely rapid pace.

**13.** In addition, it is obvious that defendant's magazine had to have been transported in interstate commerce prior to its March sales. *See New England,* 190 F.2d at 415.

**14.** In addition, defendant submits proof of its February 16 Federal trademark application which states that its first use of the "Windows User" mark in interstate commerce was January 24, 1991. On its face, this document provides that the applicant has been warned "that willful false statements ... are punishable by fine or imprisonment, or both, ... and ... may jeopardize the validity of the application or any resulting registration". *See* Munford Affid., Exh. B. As we are presented with no evidence

to conclude that the statement of January 24 first use is false, to the extent that plaintiff must rely on its March activities to demonstrate its superior right in the mark, we deem this fact to weigh against its probability of success on the merits.

**15.** Certainly, on the basis of the facts before us, defendant can maintain an equally plausible argument that plaintiff's March activities were not a *bona fide* use of the mark, but were made "merely to reserve a right in the mark". *See* 15 U.S.C. § 1127. Plaintiff's promotional activities occurred only after it had notice of defendant's intent to use the mark, and after its Principal Register application had been rejected.

What is current today, is outdated tomorrow. Plaintiff concedes that it will not be ready to publish its magazine until August 1992. Accordingly, to grant it the injunctive relief it seeks would effectively create a temporary void in the delivery of the information presently offered by the defendant's magazine [16]. We find this factor to weigh against plaintiff. *See Carey v. Klutznick* (2d Cir.1980) 637 F.2d 834, 839.

Second, we are not persuaded that should plaintiff ultimately succeed in establishing its mark, permitting defendant to continue to publish its magazine under the mark "Windows User" *pendente lite* would irreparably damage plaintiff's ability to produce and publish its magazine, or cause injury to its reputation, or a significant loss of customers or diversion of sales. Although defendant's continued presence in the marketplace pending plaintiff's ability to publish its magazine may cause plaintiff to suffer a loss of some potential customers, nothing we do today prevents plaintiff from aggressively marketing its product or from including in such marketing an announcement that its upcoming magazine is unrelated to the primarily British publication "Windows User". *Cf. McGregor–Doniger, Inc. v. Drizzle, Inc.* (2d Cir.1979) 599 F.2d 1126, 1130 (noting that irreparable injury exists where there is a likelihood that purchasers will "be misled, or indeed simply confused, as to the source of the goods in question"). On the other hand, there can be no doubt that enjoining defendant will cause it to suffer immediate monetary harm, as well as loss of actual customers, pending its ability to republish its magazine under a different name and re-educate the public concerning its contents.

Finally, we find that equity and common sense dictate the denial of an injunction at this time. Accepting as true plaintiff's contention that "two consumer magazines, under the very same name, clearly cannot co-exist on the same newsstand", *see* Munford

Affid. ¶ 38, if we grant it the injunction it seeks, and it loses at trial, plaintiff will have "needlessly devoted time, energy and financial resources to a futile endeavor". *Bertolli, U.S.A. v. Filippo Bertolli Fine Foods* (S.D.N.Y.1987) 662 F.Supp. 203, 205–206. As Judge Gurfein once observed, in connection with a grant, rather than denial, of preliminary relief:

> [A] preliminary injunctive decree in a case of this sort is sometimes an act of kindness to the party enjoined. It cuts him off from a business life which, from all the portents, would involve a series of trademark frustrations. By the time he would have attained some modicum of success, it might be taken away by court decree, making him start all over again. It is more consonant with equity to enjoin him at the threshold of his enterprise.

*George Washington Mint, Inc. v. Washington Mint, Inc.* (S.D.N.Y.1972) 349 F.Supp. 255, 263. In the instant circumstances, we deem it "consonant with equity" to leave plaintiff in the posture of exercising its own analysis of its likelihood of success on the merits and proceeding according to its own business judgement of how, and in what manner, its promotional resources should be spent pending publication of its magazine and the trial on the merits of this claim.

### Defendant's Motion for Preliminary Relief

■ With respect to defendant's countermotion for preliminary relief, we simply conclude that defendant has failed to demonstrate that it will suffer irreparable harm if it is denied such relief.

In the first place, the defendant hardly shows that plaintiff's activities have caused it to experience any great sense of danger. It first learned of them in February and was served with the complaint in this case

---

**16.** Although we are not persuaded that granting plaintiff injunctive relief would result in defendant's deciding not to publish a magazine similar to its present *Window's User,* it would force defendant to rename its magazine and concomitantly to re-educate the public concerning the content of the information any subsequent magazine offered.

on April 24. Yet it only took action to defend its claim to the mark as a response to plaintiff's claim for relief. *See Citibank, N.A. v. Citytrust* (2d Cir.1985) 756 F.2d 273, 276 ("Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement").

Second, although it might be wise for plaintiff affirmatively to market its product as distinct from defendants, assuming it chooses not to do so, we find it unlikely that the parties' simultaneous use of the mark "Windows User" *pendente lite* will cause consumer confusion concerning the source of the products/magazines at issue. *See* 15 U.S.C. § 1125(a); *Lang v. Retirement Living Pub. Co., Inc.* (2d Cir.1991) 949 F.2d 576, 583 (noting that "trademark infringement protects only against mistaken purchasing decisions and not against confusion generally"). Defendant submits an affidavit saying, in effect, that if the affiant should receive a solicitation from plaintiff, she would assume it came from defendant. *See* Washburne Declar. ¶ 8. However, it seems highly unlikely that the affiant would spend any money on that assumption before discovering her error. *See Inc. Pub. Corp. v. Manhattan Magazine, Inc.* (S.D.N.Y.1985) 616 F.Supp. 370, 386–87, 396, *aff'd without opinion* (2d Cir. 1986) 788 F.2d 3 (finding both advertisers and magazine purchasers sophisticated buyers for trademark infringement purposes); *McGraw–Hill Pub. Co. v. American Aviation Associates* (D.C.Cir.1940) 117 F.2d 293, 295 (noting that mail subscribers to magazines are sophisticated consumers).

In this regard, we note that defendant, itself—although in a different context— urges us to conclude that the mark "Windows User" is merely "descriptive" of the contents of the magazines at issue. *See* Def.Mem. at 14 [17]. Although such a finding would not mandate the conclusion that a party could not obtain trademark rights to the mark, it does call into question the strength of "Windows User" as a trademark, and concomitantly weighs against a finding that a reasonably prudent consumer would be confused as to the source of the product in the circumstances at hand. *See Plus Prods. v. Plus Discount Foods, Inc.* (2d Cir.1983) 722 F.2d 999, 1005; *Polaroid Corp. v. Polarad Elecs Corp* (2d Cir.1961) 287 F.2d 492, 495.

On the basis of these facts, and in light of the situation that it is defendant's product which is presently on sale in newsstands, we are not persuaded that defendant has demonstrated the requisite irreparable injury necessary to support the injunctive relief it here seeks. *Cf. Laureyssens v. Idea Group, Inc.* (2d Cir.1992) 964 F.2d 131, 139 ("Where there is no actual secondary meaning in a trade dress, the purchasing public simply does not associate the trade dress with a particular producer").

### CONCLUSION

Both parties' motions for preliminary relief are denied.

SO ORDERED.

---

**17.** Defendant takes this position in opposition to plaintiff's claim that it will prevail in its attempt to reverse the initial agency determination rejecting its application for the Principal Register. Defendant's own February 19 application is, however, for registration on the Principal Register.